2026 IL App (2d) 250390-U
No. 2-25-0390
Order filed July 21, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

LATOYA S. EDWARDS, a/k/a Latoya S. Heath, Defendant-Appellant.

Appeal from the Circuit Court of Lake County.
Honorable James K. Simonian, Judge, Presiding.
No. 24-CM-775

JUSTICE BIRKETT delivered the judgment of the court.
Justices McLaren and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*: Sufficient circumstances of reliability accompanied victim's identification of defendant as the individual who attempted to enter the victim's adopted child's bedroom from outside and then battered the victim outside the residence. The victim had ample opportunity to view the perpetrator, the victim's attention was focused on the perpetrator during their physical struggle, the victim did not hesitate in identifying defendant to police, and the victim was previously familiar with defendant, who was the child's biological mother.

¶ 2    After a jury trial, defendant, Latoya S. Edwards, a/k/a Latoya S. Heath, was convicted of battery (720 ILCS 5/12-3(a)(1) (West 2022)) and attempted criminal trespass to a residence (*id.* §§ 8-4(a), 19-4(a)(2)). She was sentenced to concurrent 10-month jail terms. On appeal, she argues that she was not proved guilty beyond a reasonable doubt of either offense, because the State's identification evidence was unreliable. We affirm.

¶ 3                                   I. BACKGROUND

¶ 4     As pertinent here, the State charged defendant with battery for (1) causing bodily harm to David Collins by striking him (*id.* § 12-3(a)(1)) and (2) making insulting or provoking contact with Collins by striking him (*id.* § 12-3(a)(2)). She was also charged with attempted criminal trespass to a residence for knowingly entering Collins's residence when she knew or had reason to know that one or more persons were present. The State later dismissed the second battery count. The date of the alleged offenses was June 10, 2023.

¶ 5     At trial, defendant proceeded *pro se*. For the State, Collins testified as follows. In June 2023, he resided in his North Chicago home with his wife, Priscilla Moneda, and three of their children, including two adopted children, S.J. and C.J. Defendant believed that S.J. and C.J. had been in his and Moneda's custody for six or seven years as of the date of trial. When Collins and Moneda adopted S.J. and C.J., they learned that defendant was the children's biological mother. The adoption agency showed Collins and Moneda photographs of defendant. Sometime before June 10, 2023, defendant phoned them several times. Collins recalled an occasion when defendant called Moneda. Collins took the phone from Moneda and told defendant that she should not be calling them.

¶ 6     The State introduced several exterior photographs of Collins's house. One photo showed the front of the house. On the left was the front door, and on the right was a window. A light was mounted above the front door, and a camera was mounted near the roof line at the far right end of the front side. According to Collins, the front door opened directly into the living room. A set of steps led from the front door to a concrete walkway, which Collins referenced as a "patio." Another photo showed the right side of the house, a fence running parallel to it, and a narrow concrete walkway in between. Collins identified the window to S.J.'s bedroom, which was on the right side

"about 3 feet down" from the front of the house.  Her bedroom was located "right across from the living room."

¶ 7    Collins testified that, at about 9:15 p.m. on June 10, 2023, he and Moneda were relaxing in their living room.  S.J. was in her room watching television.  The rest of the family was not there.  At one point, S.J. ran into the living room and told her parents that someone was tapping on her window.  Collins told her that there was nobody there, and S.J. returned to her room.  Less than two minutes later, S.J. came back into the living room and told Collins that she had felt a draft from the window being opened and had seen "fingers coming through the window."  Collins exited through the front door and looked down the right side of the house.  He saw someone standing at S.J.'s window.

¶ 8    Collins testified that the person he saw was a short woman wearing "all black like black pants, black shirt, and like a nylon over her head."  Collins "could see her eyes."  He called out, " 'Hey, what are you doing at that window?' "  The woman started to walk toward Collins.  She asked, " '[W]hat's up?' " and repeated this several times.  Collins told her to get off his property.  The woman walked toward him "to a point where she was right *** in [Collins's] face."  Collins continued:

> "A. [A]t that point I did say: 'Look, if you don't get out of here, I'm gonna kick your a***.'  Then when I said that, that's when she struck me in the back of the head.
>
> Q. So when she struck you in the back of the head, were you facing her?
>
> A. Yeah, facing each other, so I seen [*sic*] the swing.
>
> Q. What arm did she use to swing?
>
> A. The right.
>
> Q. Okay.  And where on your head?

A. She hit me approximately in [*sic*] the back—back on the left side."

¶ 9 Collins testified that he grabbed the woman, and they started to wrestle in the front yard. They fell "into the corner of our stairwell. Where you walk down the stairs, we fell in that corner." Collins testified further:

"Q. Did you know who it was at that time?

A. I didn't know because at that time after she—after she struck me in the head and we grabbed one another, you know, and we went in the struggle, that little scarf she had over her head, it came off. It came off, so I would be able to distinguish it was her.

Q. That it was the defendant?

A. Yeah."

¶ 10 In court, Collins identified defendant as the attacker. He testified that, after he called Moneda's name, she came outside and "witnessed the struggle."

¶ 11 Collins testified that he grabbed defendant and held onto her but never struck or kicked her. The "struggle went from the corner of the stairwell and *** somehow end[ed] up going all the way over back to where the fence was where [S.J.'s] window was." At one point, defendant put her right hand over Collins's mouth. Collins then "held onto her hand with *** [his] mouth" (he later acknowledged that he "bit[ ] her hand pretty good"). Defendant swung her left hand, hitting Collins in the nose several times. She then told him, " 'Yeah, I got something else for your a***.' " Fearing that defendant would draw a knife or gun, Collins released her and ran into the house. He saw defendant scale the fence. At that point, Moneda was on the phone with the police.

¶ 12 Collins testified that it was "pretty dark" when the confrontation occurred. However, he and the attacker were at close quarters while he "had her fingers in [his] mouth and [he] was holding her head." During that struggle, "it was light enough to where [he] could see [the

- 4 -

attacker's] face." Collins explained that there was "a little bit of lighting from the street light" and that the house had "motion detector lights that shine[d]."

¶ 13    Collins testified that his house had two security cameras: one in the front of the house and one in the rear. According to Collins, the rear camera "captured [defendant] coming towards the house." The front camera captured "audio of [Collins and defendant] having the conversation" but did not record the physical altercation that ensued. Collins also testified that his neighbor provided a video from his security camera. According to Collins, the neighbor's video showed defendant leaving the scene through an alley. Collins recognized defendant by her "long hair, *** body type[,] and everything." On that video, according to Collins, defendant was holding the hand that Collins had bitten.

¶ 14    The State played People's exhibit No. 9, which Collins identified as a video taken by his front surveillance camera, which covered part of the front yard and the street beyond it. The video is 1 minute and 52 seconds. The street is partly illuminated by car lights and a streetlight in the distance. The area immediately in front of the home—and least, the area on-camera—appears fairly dark. At marker 1:05, the front door opens. The faintly-lit figure of a person—whom Collins identified as himself—emerges and proceeds down the steps and then along the front of the house. At marker 1:17, Collins asks, "What you doing in that girl's room?" He then asks, "What the f*** you doing messing at that window?" A woman's voice responds, "What's up?" Collins repeats his question several times, and each time, the woman responds, "What's up?" Collins repeatedly orders the woman to leave his yard, and the woman responds as before. At marker 1:49, the light above the front steps turns on, illuminating the immediate area. Collins threatens to "f*** [the woman] up." The video ends. According to Collins, the ensuing physical altercation took place beyond the camera's view.

¶ 15 The State then played People's exhibit No. 10, which Collins identified as a video from his neighbor's surveillance camera. The video is 17 seconds and shows a woman in an alley, proceeding toward the camera. She jogs initially, then slows to a walk. Her clothes appear dark, and her face is uncovered. Collins identified the woman as defendant and noted that she was not wearing the scarf she wore before their physical struggle.

¶ 16 The State played People's exhibit No. 11, which Collins identified as another video from his neighbor's surveillance camera. The video is 14 seconds and shows a woman in an alley, walking away from the camera. She appears to be the same woman depicted in People's exhibit No. 10. According to Collins, the video showed defendant "walking away" from the scene.

¶ 17 The trial court also admitted People's exhibit Nos. 12 through 14, which Collins identified as police photographs showing his injuries from the struggle. Collins testified that the police took the photographs when they arrived at the home "[a]fter the incident[,] *** maybe 7 to 10 minutes later."

¶ 18 On cross-examination, defendant asked Collins whether he noticed that the attacker had tattoos and a missing tooth (as defendant asserted she did). Collins testified that, when he first saw the attacker, her face was covered by a scarf, so "the only thing [he] could see at that moment was just [her] eyes." Collins "memorized [the attacker's] eyes" as they "were looking right at each other" close up.

¶ 19 Collins was asked: "So the night in question—did you talk to the police the next day, the detectives or any police officer the next day or that same night at the police station?" He answered:

"Well, I talked to the police. I gave the report that night. I don't really recall when we went back to the police station, you know? The detective, I believe, contacted us is [*sic*] when we had the interview, but I couldn't tell you exactly when—when. I just remember

going to the police station, and they made me fill out a report and explain what happened. I filled out a report. We were able to give them copies of your photos because I was able to, you know, identify you to them. We used Facebook, showed them it was you, showed them it was your picture, distinguished that it was you."

¶ 20 Moneda testified as follows. On the evening of June 10, 2023, she and Collins were relaxing in their living room. S.J. came out of her room and told Collins that someone was tapping at her window. Collins doubted her and told her to return to her room. "Seconds later," S.J. returned to the living room and told Collins that someone was at her window and that the window was opening. She said that she saw hands. Collins went outside to check, and Moneda stayed in the living room with S.J. Soon, there was commotion outside, and Moneda heard Collins repeatedly shouting her name. Moneda exited the front door, and, from the "patio," *i.e.*, "the top of the stairs," she saw Collins "tussling with a person" by the window next to the front door. In court, Moneda identified defendant as the other combatant. Asked how she knew that it was defendant, Moneda testified that, when Collins and the other person were "tussling," they were "in the means of face to face," and Moneda "ended up seeing [defendant's] face while they were tussling." Moneda then ran back into the house to call the police.

¶ 21 Moneda testified that she had "interact[ed]" with defendant "[b]efore the adoption ever occurred." Asked about the nature of that "interaction," Moneda testified that, before the adoption, Moneda obtained a photograph of defendant from the adoption caseworker and also viewed defendant's photograph on Facebook. Defendant wrote the caseworker that she did not want Moneda to adopt her children because they were Black and she was Asian, and the caseworker relayed the letter to Moneda. Later, after the two children had been adopted, defendant would call

- 7 -

Moneda and demand to speak to them; Moneda refused the demands and told defendant to contact the caseworker.

¶ 22    The State rested.  In her case, defendant introduced another surveillance video.  The video is 1 minute and 52 seconds.  It shows a woman walking in an alley lit by a streetlight behind her. Only her silhouette is visible, but she appears to be the same woman seen in People's exhibit Nos. 10 and 11.[1]

¶ 23    The jury found defendant guilty of count I (battery) and count III (attempted criminal trespass to property).  The trial court sentenced her to concurrent 10-month jail terms and denied her motion to reconsider the sentences.  Defendant timely appealed.

¶ 24                                    II. ANALYSIS

¶ 25    On appeal, defendant contends that she was not proved guilty because the evidence was insufficient to establish the identity of the perpetrator.

¶ 26    When deciding a challenge to the sufficiency of the evidence, we ask whether, viewing all of the evidence in the light most favorable to the prosecution, any rational finder of fact could have found the essential elements of the offense proved beyond a reasonable doubt.  *People v. Baskerville*, 2012 IL 111056, ¶ 31.  It is not our function to retry the defendant.  *People v. Lamon*, 346 Ill. App. 3d 1082, 1089 (2004).  Rather, the trier of fact remains responsible for determining witness credibility, the weight to be given the testimony, and the reasonable inferences to be drawn from the evidence.  *People v. Ross*, 229 Ill. 2d 255, 272 (2008).  We will set aside a conviction "only where the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt."  *People v. Bush*, 2023 IL 128747, ¶ 33.

_____

[1]This video might have been the one from Collins's rear surveillance camera that he said "captured [defendant] coming towards the house."  However, the State did not introduce the video in its case.

¶ 27    The State may prove identity through the testimony of a single credible eyewitness if the witness viewed the offender under circumstances permitting a positive identification. *People v. Lewis*, 165 Ill. 2d 305, 356 (1995). The relevant circumstances include (1) the opportunity the witness had to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the identification confrontation; and (5) the length of time between the crime and the identification confrontation. *Id.*

¶ 28    Defendant contends that these factors militate against the reliability of the identifications made by Collins and Moneda. Defendant argues that that Collins saw only her eyes (factor (1)); that the incident occurred in the "dark of night" (factor (1)); that both Collins and Moneda saw the attacker only momentarily or fleetingly (factors (1) and (2)); that Collins could not recall details of the attacker's appearance (factors (3) and (4)); and that there was no evidence of how much time elapsed between the attack and Collins's visit to the police department, where he identified defendant as the attacker (factor (5)). Defendant concedes that both Collins and Moneda had seen photographs of her, but she reasons that, because those photographs were not introduced at trial, the jury could not decide whether they aided in the identifications.

¶ 29    We are unpersuaded by defendant's arguments, which minimize or ignore several important considerations on which the jury could have relied to find identity beyond a reasonable doubt.

¶ 30    First, defendant is mistaken that Collins and Moneda testified to seeing only the attacker's eyes. Collins did testify that, *when he first noticed the attacker*, he "could see her eyes." But even if we construe this to mean that he initially saw *only* her eyes, defendant is still mistaken. Collins testified that, after the attacker struck him in the head and they started to wrestle, "that little scarf she had over her head *** came off," so that he was "able to distinguish it was her," *i.e.*, defendant.

- 9 -

He also testified that during the struggle, "it was light enough to where [he] could see [the attacker's] face." Moneda, who also viewed the fight after it moved to the vicinity of the patio, testified that she "ended up seeing [the attacker's] face while they were tussling."

¶ 31    We note second that, as the foregoing implies, the setting was not as dark as defendant suggests. People's exhibit No. 9, the front surveillance video, was recorded from an elevated position. According to Collins, the physical struggle took place out of camera view. He testified that that area was partly illuminated by streetlights and motion detection lights. Indeed, the video shows that, just before the struggle ensued, the light above the front steps turned on, illuminating the immediate area. Even if the video did not directly undercut defendant's position, it certainly did not refute Collins's testimony about the lighting conditions beyond camera view—and the jury was entitled to believe him on that point.

¶ 32    We note third that defendant's contention that Collins and Moneda saw the attacker only momentarily is refuted by the evidence. Collins's testimony narrated a confrontation and struggle that went back and forth along the front of the house. The incident involved (1) a verbal interchange that, as recorded on video, lasted approximately 35 seconds and (2) a physical altercation with several blows and a wrestling match. Notably, during the struggle, Collins and the attacker were face-to-face, to the point where she could put her hand on his face and stick her fingers in his mouth. Moneda testified that she saw Collins and the attacker fighting near the patio and then ran back into the house to call the police. However, nothing in her testimony compelled an inference that she viewed the scene only momentarily.

¶ 33    Fourth, defendant omits context in observing that, on cross-examination, Collins could not identify specific details of the attacker's face. Collins's answer was focused on the period when

the attacker's scarf covered all of her face except her eyes. Defendant did not follow up on this line of questioning. Therefore, defendant's observation has no force here.

¶ 34     Fifth, equally misplaced is defendant's emphasis on Collins's inability to recall "exactly when" he went to the police department and told them of defendant's involvement. Collins's prior familiarity with defendant through photographs and phone conversations diminishes the significance of the interval between the incident and the police station visit. Indeed, *the police* did not present *Collins* with photographs of possible suspects; *he* showed *them* a photograph of defendant to show who attacked him. See *People v. Brooks*, 187 Ill. 2d 91, 130 (1999) (the victim's prior familiarity with the defendant is a factor in judging the reliability of an identification).

¶ 35     With these clarifications in mind, we address the five-factor test and conclude that the State's evidence passed easily. On the first factor, Collins had an excellent opportunity to view the perpetrator at the time of the offense. He and his attacker were literally in each other's face for an extended period, during part of which the attacker's entire face was visible. At such close range, approximately 50 minutes after sunset on June 10,[2] perfect artificial lighting was not needed—but, in fact, there was substantial lighting from several sources. Moneda also had an opportunity to view the attacker during the struggle (and, in any event, the State did not need a second eyewitness to prove identity beyond a reasonable doubt).

---

[2]We may take judicial notice of sunrise and sunset times. See Ill. R. Evid. 201 (eff. Jan. 1, 2011); *Owens v. Duncan*, 781 F.3d 360, 364 (7th Cir. 2015). Here we take judicial notice of the fact that sunset on June 10, 2023, in North Chicago was at 8:27 p.m., civil twilight ended at 9:01 p.m., nautical twilight ended at 9:46 p.m., and astronomical twilight ended at 10:40 p.m. North Chicago, Ill., USA—Sunrise, Sunset, and Daylength, June 2023, https://www.timeanddate.com/sun/@4903862?month=6&year=2023 (last visited July 10, 2026) [https://perma.cc/DF38-H38A].

¶ 36 On the second factor, Collins's degree of attention during the incident was obviously very high, as he was the victim of an attack by a person who punched him, struggled with him, stuck her fingers in his mouth, and held onto him until he broke free. He was surely not a mere bystander. Moneda was a bystander, but one whose husband was being subjected to violence, so it was a fair inference that she was paying close attention to the incident, albeit not for as long as Collins did.

¶ 37 The third factor does not apply, because neither Collins nor Moneda appear to have given a prior description of the attacker.

¶ 38 On the fourth factor, nothing in the record suggests that Collins or Moneda showed any doubt or hesitancy in identifying defendant as the perpetrator.

¶ 39 On the fifth factor, although Collins could not recall "exactly when" he came to the police department and informed them of defendant's involvement, that interval is of little relevance, given defendant's prior familiarity with defendant's appearance and voice. Collins and Moneda had at least one heated phone conversation with defendant and had seen her in photographs supplied by the adoption agency and photographs they found on Facebook. (The mere fact that these photographs were not in evidence did not vitiate the effect of this fact. The jury still learned that the witnesses already knew what defendant looked like.)

¶ 40 Finally, we note that defendant had an apparent motive to perpetrate the trespass offense, as the jury heard that she had objected to Moneda's custody of the minors and that she had expressed frustration with being unable to stay in contact with them. This background makes it more probable that it was defendant, not some random stranger, who showed up at night at S.J.'s bedroom window in an apparent attempt to meet with (or possibly abduct) her.

¶ 41 III. CONCLUSION

¶ 42 For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 43    Affirmed.